**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| EDMUND P. HARRIGAN, MD<br><br>Plaintiff,<br><br>v.<br><br>PURETECH VENTURES, LLC,<br>N/K/A PURETECH HEALTH LLC,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br><br><br><br>Civil Action No:<br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Edmund P. Harrigan, MD ("Dr. Harrigan" or "Plaintiff"), by and through his attorneys, brings this action against PureTech Ventures, LLC, n/k/a PureTech Health LLC ("PureTech" or "Defendant"), and alleges as follows.

**NATURE OF THE ACTION**

1. This is an action for breach of contract and declaratory judgment. In violation of a long-standing written contract in which PureTech promised to share a percentage of certain revenues with Dr. Harrigan, PureTech has refused to pay Dr. Harrigan his promised percentage of approximately $100 million dollars.

2. PureTech does not deny the existence of the parties' written contract. Instead, PureTech rests on its misplaced assertions that Dr. Harrigan's employment status with a company formed by PureTech that licenses intellectual property from PureTech somehow affected PureTech's obligations under the contract or, alternatively, that PureTech's transaction with a third party (i.e., a buyer of biopharmaceutical royalties) precludes Dr. Harrigan's recovery of the

agreed-upon percentage, notwithstanding that the contract contemplates such transactions with third parties.

3. Back in 2011, Defendant PureTech licensed certain intellectual property to Karuna Pharmaceuticals, Inc. ("Karuna") in that certain Exclusive Patent License Agreement dated March 4, 2011 ("Karuna License Agreement"). In exchange, Karuna agreed to pay financial consideration to PureTech in the form of running royalties, milestone payments, and a percentage of sublicense income.

4. In the contract that forms the basis of this action, titled "Income Allocation Agreement" and dated March 4, 2011 (dated the same day as the Karuna License Agreement) ("Income Allocation Agreement"), PureTech agrees to pay Dr. Harrigan a percentage of "any payment or consideration received by PureTech pursuant to the terms of the License Agreement or as consideration for the assignment or sale of the License Agreement to any party other than Karuna or a wholly-owned subsidiary of Karuna."

5. Over the last decade and counting, the product licensed to Karuna under the Karuna License Agreement has generated significant financial payments to PureTech to date and promises significantly more financial payments in the future. The licensed product is known as KarXT.

6. According to public sources, KarXT has completed a Phase III clinical trial for the indication of Schizophrenia.[1] At this time, Karuna awaits final approval from the U.S. Food and Drug Administration ("FDA") for commercialization of KarXT, with the FDA's review period ending in September 2024. Karuna's website also indicates that KarXT is well into two

[1] Karuna Therapeutics, Pipeline & Programs, https://karunatx.com/pipeline-programs/ (last accessed March 13, 2024).

additional Phase III trials for two separate indications: Schizophrenia Adjunctive therapy and Psychosis in Alzheimer's disease, respectively.

7. Market analysts predict KarXT could generate approximately $5 billion in U.S. sales revenue annually. For example, on December 22, 2023, William Blair (a premier global boutique with expertise in investment banking, investment management, and private wealth management) projected based on its model that KarXT could generate "2030 U.S. sales of $2.5 billion in schizophrenia alone" as well as with potential indication expansion into Alzheimer's disease psychosis "another $2.4 billion+ U.S. market opportunity using conservative metrics."

8. Trying to rescind its deal with Dr. Harrigan, PureTech now claims that Dr. Harrigan is not entitled to any payment or consideration under the Income Allocation Agreement. Indeed, PureTech has breached its contractual obligations and has failed to compensate Dr. Harrigan as promised.

9. Through this lawsuit, Dr. Harrigan seeks the payment and consideration owed to him by PureTech under the Income Allocation Agreement.

10. Through this lawsuit, Dr. Harrigan also seeks a declaratory judgment with respect to Dr. Harrigan's rights and PureTech's future obligations under Section 2(a) of the Income Allocation Agreement.

## PARTIES

11. Plaintiff Edmund P. Harrigan, MD, is an individual and is a citizen of and domiciled in the state of New Hampshire. Dr. Harrigan is the former President and Chief Executive Officer of Karuna. Dr. Harrigan is also a former director of the Board of Directors of Karuna.

12. Upon information and belief, PureTech Ventures, LLC, n/k/a PureTech Health

LLC, is a Delaware limited liability company that was founded in or about 2000 as a venture capital firm based in Boston, Massachusetts, with a corporate office located at 6 Tide Street, Suite 400, Boston, Massachusetts, 02210. Also, upon information and belief, PureTech Ventures, LLC, n/k/a PureTech Health LLC, is a wholly-owned subsidiary of PureTech Health plc., which is a publicly traded company on the London Stock Exchange, a company incorporated under the laws of England and Wales, and headquartered in Boston, Massachusetts. For purposes of diversity of citizenship, upon information and belief, PureTech Ventures, LLC, n/k/a PureTech Health LLC, has only one member, PureTech Health plc.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because the parties are diverse in citizenship and the amount in controversy exceeds $75,000. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367.

14. This Court has personal jurisdiction over PureTech because, *inter alia*, PureTech has its principal place of business and is "at home" in Massachusetts, PureTech transacts or has transacted business within the Commonwealth of Massachusetts, and/or PureTech otherwise avails itself of the privileges and protections of the laws of the Commonwealth of Massachusetts.

15. Venue is proper in this judicial district under 28 U.S.C. § 1391 because PureTech resides in this district, a substantial part of the events or omissions giving rise to Dr. Harrigan's claims occurred in this district, and because this Court has personal jurisdiction over PureTech.

## FACTS COMMON TO ALL CLAIMS

16. Dr. Harrigan has over thirty years of experience in the pharmaceutical industry, holding various leadership positions at prestigious companies. Before entering the

pharmaceutical industry in 1990, Dr. Harrigan was a practicing neurologist for approximately seven years.

**PureTech's Recruitment of Dr. Harrigan As CEO of Karuna and Dr. Harrigan's Employment with Karuna Beginning in January 2011**

17. In or about 2009, Karuna was founded by PureTech. In 2010, Daphne Zohar, founder and chief executive officer of PureTech, began recruiting Dr. Harrigan for the role of President and Chief Executive Officer of Karuna. At that time, Karuna was a privately owned company.

18. During the recruitment phase, Dr. Harrigan was made aware that PureTech held equity in Karuna.

19. At the time of his recruitment, Dr. Harrigan had recently started his own consulting business and was considering opportunities with smaller pharmaceutical companies. Prior to that, Dr. Harrigan had worked most recently as Senior Vice President at Pfizer Inc.

20. Dr. Harrigan and Karuna entered into an employment agreement as of January 1, 2011, for Dr. Harrigan's employment as President and Chief Executive Officer of Karuna ("Employment Agreement"). Under that Employment Agreement, Dr. Harrigan also was to serve as a director on Karuna's Board of Directors during the term of his employment with Karuna.

21. The Employment Agreement provided, among other things, that in exchange for Dr. Harrigan providing the scope of his services as President and Chief Executive Offer, Karuna agreed to pay Dr. Harrigan a base salary and certain bonuses. The Employment Agreement also provided for Dr. Harrigan's participation in equity in Karuna.

22. At the time Karuna employed him, Dr. Harrigan understood there was intellectual property of interest in connection with the potential treatment of schizophrenia. He was not informed, however, that such intellectual property was not owned by Karuna or had not yet been

licensed to Karuna.

**Exclusive Patent License Agreement between Karuna and PureTech Effective March 2011**

23. A few months after Karuna employed Dr. Harrigan, Karuna and PureTech entered into the Karuna License Agreement. Daphne Zohar, as Managing Partner of PureTech, signed the Karuna License Agreement on behalf of PureTech. Dr. Harrigan, then-CEO of Karuna, signed the Karuna License Agreement on behalf of Karuna.

24. A copy of the Karuna License Agreement in redacted form was and continues to be available to the public. *See* https://www.sec.gov/Archives/edgar/data/1771917/000119312519162773/d709743dex1011.htm. Previously redacted portions of the Karuna License Agreement have since become public by, for example, subsequent press releases, as described below.

25. PureTech and Karuna entered into the Karuna License Agreement because PureTech "desire[d] to have the Patent Rights developed and commercialized by [Karuna]." The "Patent Rights," as Karuna has publicly disclosed, involve patents relating to combinations of a muscarinic activator with a muscarinic inhibitor for the treatment of central nervous system disorders.

26. Under Section 2.1 of the Karuna License Agreement entitled "License Grants," PureTech grants Karuna for the defined term "a royalty-bearing exclusive license (even as against PureTech) under the Patent Rights to research, develop, make, have made, use, offer for sale, sell, lease, import and otherwise exploit Licensed Products" in the defined field in the defined territory.

27. In exchange for the "License Grants," Karuna agrees to pay PureTech: (i) running royalties, (ii) milestone payments, and (iii) shares of sublicense income, as described more fully

in Section 3.1 “Consideration for Grant of Rights” in Article 3 entitled “Royalties and Payment Terms.”

28. Under Section 3.1(a) entitled “Running Royalties,” Karuna agrees to pay PureTech “a running royalty” of a percentage of “annual Net Sales by the Company, its Affiliates and any Sublicensees.”

29. Under Section 3.1(b) entitled “Milestone Payments,” Karuna agrees to pay PureTech millions of dollars in milestone payments of certain designated amounts for the following four milestones: (i) within a certain period of time “following the commencement of a “Phase III Clinical Trial of a Licensed Product,” (ii) within a certain period of time “following approval by the U.S Food and Drug Administration, or any successor thereto, to offer for sale and sell (including any necessary price approvals) any Licensed Product;” (iii) within a certain period of time “following approval by the European Medicines Evaluation Agency or any other European regulatory authority, or any successor thereto, to offer for sale and sell (including any necessary price approvals) any Licensed Product;” and (iv) within a certain period of time “following approval by the Japanese Ministry of Health and Welfare, or any successor thereto, to offer for sale and sell (including any necessary price approvals) any Licensed Product.”

30. Under Section 3.1(c) entitled “Sharing of Sublicense Income,” Karuna agrees to pay PureTech a certain percentage of “all Sublicense Income received by the Company or its Affiliates, excluding running royalties on Net Sales of Sublicensees.”

31. Section 13.4 of the Karuna License Agreement, entitled “Amendment and Waiver,” provides that such Agreement “may be amended, supplemented, or otherwise modified only by means of a written instrument signed by both Parties.”

32. Based on information available to Dr. Harrigan, including through information

available to the public, Article 3 of the Karuna License Agreement "Royalties and Payment Terms" has never been amended by PureTech and Karuna.

33. Section 13.8 of the Karuna License Agreement, entitled "Entire Agreement," also provides that such Agreement "constitutes the entire agreement between the parties with respect to its subject matter and supersedes all prior agreements or understandings between the parties relating to its subject matter." Therefore, Article 3 "Royalties and Payment Terms" constitutes the entire agreement between Karuna and PureTech as to Karuna's financial obligations to PureTech under the Karuna License Agreement.

34. Section 13.2 of the Karuna License Agreement, entitled "Governing Law," provides in part that such Agreement "and all disputes arising out of or related to this Agreement, or the performance, enforcement, breach or termination hereof, and any remedies relating thereto, shall be construed, governed, interpreted and applied in accordance with the laws of the Commonwealth of Massachusetts."

35. PureTech and Karuna subsequently amended the Karuna License Agreement by written amendment on February 1, 2013 (Amendment No. 1), February 25, 2015 (Amendment No. 2), and July 31, 2015 (Amendment No. 3). None of these Amendments amend Karuna's financial obligations to PureTech including under Article 3 of the Karuna License Agreement.

**Income Allocation Agreement between Dr. Harrigan and PureTech Effective March 2011**

36. On the same date that the Karuna License Agreement became effective, the Income Allocation Agreement between Dr. Harrigan and PureTech became effective. The purpose of such Income Allocation Agreement was to memorialize the financial terms by which Dr. Harrigan and PureTech agreed that Dr. Harrigan would receive a portion of the revenues otherwise payable to PureTech.

37. Absent the Income Allocation Agreement, PureTech would have been in a disproportionately and significantly better financial position than Dr. Harrigan, a position the parties did not intend. For example, on the one hand, Dr. Harrigan's stock options in Karuna were subject to dilution upon the issuance of additional equity by Karuna. On the other hand, PureTech, while also an equity owner of Karuna, was entitled to financial consideration under the Karuna License Agreement regardless of any potential dilution upon the issuance of additional equity by Karuna.

38. In recognition of the disproportionate interests of PureTech and Dr. Harrigan, PureTech and Dr. Harrigan entered into the Income Allocation Agreement to better align and balance their interests so that, like PureTech, Dr. Harrigan would hold his equity in Karuna and also receive a portion of the revenues otherwise payable to PureTech.

39. Under Section 2(a) of the Income Allocation Agreement, PureTech agrees to pay Dr. Harrigan two categories of payments, each a "License Payment": (1) "any payment or consideration received by PureTech pursuant to the terms of the License Agreement" multiplied by the "Vested Percentage" (a defined term) and (2) "consideration for the assignment or sale of the License Agreement to any party other than Karuna or a wholly-owned subsidiary of Karuna" multiplied by the "Vested Percentage." In its entirety, Section 2(a) provides:

> 2. <u>Income Allocation</u>.
>
> (a) PureTech shall pay to the Executive an amount equal to the product of (x) any payment or consideration received by PureTech pursuant to the terms of the License Agreement or as consideration for the assignment or sale of the License Agreement to any party other than Karuna or a wholly-owned subsidiary of Karuna (each, a "License Payment") multiplied by (y) the Vested Percentage (as defined below).

40. Section 2(b) of the Income Allocation Agreement defines the "Vested Percentage" as a certain fixed percentage or a lesser percentage if Dr. Harrigan's employment with Karuna is

terminated by Dr. Harrigan or Karuna on or prior to December 31, 2014.

41. For example, Section 2(b)(i) of the Income Allocation Agreement provides that if Dr. Harrigan's employment with Karuna is terminated by Dr. Harrigan or Karuna "prior to June 30, 2011," the "Vested Percentage shall be 0%."

42. By way of another example, Section 2(b)(ii) of the Income Allocation Agreement provides that if Dr. Harrigan's employment with Karuna is terminated by Dr. Harrigan or Karuna "on or after June 30, 2011 but prior to December 31, 2011," the "Vested Percentage shall be" a certain fixed percentage.

43. By way of another example, Section 2(b)(iii) of the Income Allocation Agreement provides that if Dr. Harrigan's employment with Karuna is terminated by Dr. Harrigan or Karuna "on or after December 30, 2011 but prior to January 1, 2012," the "Vested Percentage shall be" a higher certain fixed percentage.

44. As relevant here, Section 2(b)(iv) of the Income Allocation Agreement provides that, "[i]f the Termination Date occurs on or after January 1, 2012 but prior to December 31, 2014, the Vested Percentage shall be equal to" a percentage "plus an additional" percentage "for each full month [Dr. Harrigan] has been employed by Karuna between December 31, 2011 and the Termination Date."

45. The calculation of the Vested Percentage under the Income Allocation Agreement was tied to Dr. Harrigan's length of employment only. The calculation of the Vested Percentage did not depend on Dr. Harrigan's performance as CEO of Karuna, Dr. Harrigan's performance as a Karuna board member, or whether Dr. Harrigan resigned or was terminated from his employment with Karuna.

46. As discussed further below, Dr. Harrigan's resignation from his employment at

Karuna was effective as of January 31, 2012. Under Section 2(b)(iv) of the Income Allocation Agreement, his Vested Percentage is thus a certain fixed percentage calculated in accordance with the Income Allocation Agreement.

47. In addition to the License Payments set forth in Section 2(a) of the Income Allocation Agreement, Dr. Harrigan is also entitled to interest, including under Section 2(d) of the Income Allocation Agreement.

48. Section 4(h) of the Income Allocation Agreement, entitled "Entire Agreement," provides that such Agreement "embodies the entire agreement and understanding among the parties with respect to the subject matter hereof and related transactions, and supersedes all prior agreements and understandings among the parties, written or oral, with respect thereto."

49. Section 4(d) of the Income Allocation Agreement, entitled "Governing Law," provides that such Agreement "shall be governed by and construed in accordance with the laws of the State of Delaware." That same Section provides that the Income Allocation Agreement "shall be treated in all respects as a Delaware contract."

50. At no time have PureTech and Dr. Harrigan amended the Income Allocation Agreement.

**Dr. Harrigan's Resignation from Employment With Karuna**

51. In a letter dated January 24, 2012, and addressed to Karuna's Board of Directors, Dr. Harrigan tendered his resignation of his position as President and Chief Executive Officer of Karuna with an effective resignation date of January 31, 2012.

52. Dr. Harrigan and Karuna mutually decided that Dr. Harrigan would continue to serve as a Director of Karuma's Board of Directors. Dr. Harrigan did so until his resignation in December 2020. Dr. Harrigan served in this role during the time of Karuna's initial public

offering, which occurred in June 2019.

**Karuna's Subsequent Repeated Public Acknowledgments of Certain of PureTech's Contractual Obligations to Dr. Harrigan**

53. Well after Dr. Harrigan tendered his resignation as President and Chief Executive Officer of Karuna in January 2012, Karuna has publicly and repeatedly acknowledged certain of PureTech's financial obligations to Dr. Harrigan under the Income Allocation Agreement as triggered by Karuna's financial obligations to PureTech.

54. In Karuna's Form S-1, Registration Statement under the Securities Act of 1933 that was filed with the Securities and Exchange Commission on May 31, 2019, Karuna stated the following after its discussion of the Karuna License Agreement: "Pursuant to an allocation agreement, dated March 4, 2011 between PureTech Health and Edmund Harrigan, M.D., a member of our board of directors and our Chief Executive Officer from January 2011 until February 2012, Dr. Harrigan will receive an amount equal to less than 2.0% of any consideration we pay to PureTech Health pursuant to the terms of the Patent License Agreement" (i.e., the Karuna License Agreement).

55. At the time of the filing of Karuna's Registration Statement, several of Karuna's directors on its Board of Directors were associated with and officers of PureTech's parent company (including President and Chief of Business and Strategy, Chief Innovation Officer, and Chief Financial Officer), and thus PureTech was aware of the existence and full force and effect of the Income Allocation Agreement as referenced in Karuna's 2019 Registration Statement.

56. In Karuna's Amendment No. 1 to Form S-1, Registration Statement under the Securities Act of 1933 that was filed with the Securities and Exchange Commission on June 17, 2019, Karuna repeated after its discussion of the Karuna License Agreement: "Dr. Harrigan will receive an amount equal to less than 2.0% of any consideration we pay to PureTech Health

pursuant to the terms of the Patent License Agreement" (i.e., the Karuna License Agreement).

57. In Karuna's Form 424(b)(4) filed on June 28, 2019 for an initial offering of shares of common stock, Karuna similarly stated: "Dr. Harrigan will receive an amount equal to less than 2.0% of any consideration we pay to PureTech Health pursuant to the terms of the Patent License Agreement" (i.e., the Karuna License Agreement).

58. Subsequently, in Karuna's (i) Form S-1, Registration Statement under the Securities Act of 1933 that was filed with the Securities and Exchange Commission on November 18, 2019, (ii) Form 424(b)(4) filed on November 21, 2019, and (iii) "Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934" dated April 29, 2020, Karuna made the same representations regarding PureTech's obligations and Dr. Harrigan's rights under the Income Allocation Agreement.

59. According to Karuna's "Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934" dated April 29, 2020, Karuna, as of that time, had "not paid any fees to date to PureTech Health to date pursuant to the Patent License Agreement" (i.e., the Karuna License Agreement).

**Karuna's Sublicense to Zai Lab in November 2021 and Karuna's Subsequent Payment to PureTech**

60. In a November 9, 2021 press release, Karuna announced its entry of an exclusive license agreement with licensee Zai Lab Limited (NASDAQ: ZLAB; HKEX: 9688), a global biopharmaceutical company ("Zai Lab") for the development, manufacturing, and commercialization of KarXT in Greater China, including mainland China, Hong Kong, Macau, and Taiwan.[2] This exclusive license agreement with Zai Lab is a sub-license under the terms of

[2] Karuna Therapeutics, "Karuna Therapeutics and Zai Lab Announce Strategic Collaboration for Development, Manufacturing, and Commercialization of KarXT in Greater China," November 9,

the Karuna License Agreement.

61. The press release for the Zai Lab sub-license explains that KarXT (xanomeline-trospium) is an oral, investigational M1/M4-preferring muscarinic acetylcholine receptor agonist in development for the treatment of psychiatric and neurological conditions, including schizophrenia and dementia-related psychosis. According to the November 2021 press release, KarXT preferentially stimulates muscarinic receptors in the central nervous system implicated in these conditions, as opposed to current antipsychotic medicines, which bind to the D2 dopamine receptor. According to that same press release, KarXT has the potential to usher in a new class of treatment for schizophrenia and dementia-related psychosis based on its differentiated mechanism of action.

62. That same November 9, 2021 press release explains that under the terms of the exclusive license agreement between Karuna and Zai Lab (which is a sub-license under the terms of the Karuna License Agreement), Karuna will receive a $35 million upfront payment and is eligible to receive up to an additional $80 million in development and regulatory milestones. According to the press release, Karuna is also eligible to receive up to $72 million in sales milestones and low-double-digit to high-teens tiered royalties based on annual net sales of KarXT in Greater China, and Zai Lab will fund substantially all development, regulatory, and commercialization activities in Greater China.

63. On the same day, PureTech announced, in its own press release, details concerning that same exclusive license agreement between Karuna and Zai Lab—which is a sub-license under the terms of the Karuna License Agreement.[3]

---

2021, https://investors.karunatx.com/news-releases/news-release-details/karuna-therapeutics-and-zai-lab-announce-strategic-collaboration (last accessed March 13, 2024).

[3] PureTech Health plc, "PureTech Founded Entity Karuna Therapeutics and Zai Lab Announce

64. According to Karuna's publicly available 2023 Annual Report (10-K) with a filing date of February 22, 2024, Karuna had "paid less than $0.1 million in sublicense income associated with the Zai License Agreement to PureTech Health in 2021" and that "[a]s of December 31, 2023, no other royalty payments have been made under the" Karuna License Agreement.

65. Even though PureTech has previously received payment from Karuna from the Zai Lab sub-license, PureTech has failed to pay Dr. Harrigan for his share of such sublicense income as required by the Income Allocation Agreement.

**Royalty Purchase Agreement between PureTech and Royalty Pharma in March 2023 and Payments to PureTech Thereunder**

66. In a March 23, 2023, press release, PureTech's parent PureTech Health plc (Nasdaq: PRTC, LSE: PRTC), announced a transaction with Royalty Pharma plc (Nasdaq: RPRX), the largest buyer of biopharmaceutical royalties founded in 1996.[4] Royalty Pharma plc is neither Karuna nor a wholly-owned subsidiary of Karuna.

67. A redacted copy of the Royalty Purchase Agreement between PureTech, PureTech Health plc, and Royalty Pharma Investments 2019 ICAV ("Royalty Pharma") dated as of March 22, 2023 ("Royalty Purchase Agreement") is available online to the public, including as Exhibit 4.37 to PureTech Health plc's Form 20-F filing with the Securities and Exchange Commission filed on April 28, 2023, available at https://investors.puretechhealth.com/node/12311/html.

---

Strategic Collaboration for Development, Manufacturing, and Commercialization of KarXT in Greater China," November 9, 2021, https://news.puretechhealth.com/news-releases/news-release-details/puretech-founded-entity-karuna-therapeutics-and-zai-lab-announce (last accessed March 13, 2024).

[4] PureTech Health plc, "PureTech Health and Royalty Pharma Enter into KarXT Royalty Agreement for up to $500 Million," March 23, 2023, https://news.puretechhealth.com/news-releases/news-release-details/prtc-gets-500m-rprx-karxt-royalty (last accessed March 13, 2024).

68. The March 23, 2023, press release explains that Royalty Pharma acquired an interest in PureTech's royalty in Karuna's KarXT product under the Karuna License Agreement "for up to $500 million, with $100 million in cash up front and up to $400 million in additional payments contingent on the achievement of certain regulatory and commercial milestones."

69. That same March 22, 2023, press release also explains that Royalty Pharma and PureTech will share in royalties above certain annual sales thresholds. The press release details that as part of the transaction, PureTech "sold its right to receive a 3% royalty from Karuna to Royalty Pharma" (under the Karuna License Agreement) "on sales up to $2 billion annually, after which threshold Royalty Pharma will receive 33% and PureTech will retain 67% of the royalty payments." This same press release also announced that under the Karuna License Agreement, "PureTech retains the right to receive milestone payments upon the achievement of certain regulatory approvals and 20% of sublicense income."

70. On the same day, Royalty Pharma, in its own press release, announced details concerning that same transaction between it, PureTech, and PureTech Health plc.[5]

71. Under the Royalty Purchase Agreement, Royalty Pharma paid PureTech an "Initial Purchase Price" of $100 million at the closing.

72. Under the Royalty Purchase Agreement, Royalty Pharma also agrees to pay PureTech "Additional Purchase Price Payments," totaling $400 million over time to PureTech. The nine "Payment Triggering Events" are redacted from public view but upon information and belief correspond to one or more of the regulatory and commercial milestones set forth in the

---

[5] Royalty Pharma, "Royalty Pharma and PureTech Health Enter Into KarXT Royalty Agreement for Up to $500 Million," March 23, 2023, https://www.royaltypharma.com/news-releases/news-release-details/royalty-pharma-and-puretech-health-enter-karxt-royalty-agreement (last accessed March 13, 2024).

Karuna License Agreement.

73. Upon information and belief, Royalty Pharma has paid PureTech for some "Payment Triggering Events" as required by the Royalty Purchase Agreement.

74. Even though PureTech has received payments from Royalty Pharma, including at least an up-front payment of $100 million, PureTech has failed to compensate Dr. Harrigan for his portion of the revenues otherwise payable to PureTech, as required by the Income Allocation Agreement.

75. PureTech also did not inform Dr. Harrigan of the existence of the Royalty Purchase Agreement. It was Dr. Harrigan that raised its existence with PureTech in late March 2023, as discussed below.

**Recently Announced Sale of Karuna in Late 2023 and Predicted Success of KarXT as Most Anticipated Drug Launch of 2024**

76. In a press release dated December 22, 2023,[6] Karuna Therapeutics, Inc. (NASDAQ: KRTX) announced that it entered into a definitive merger agreement which Bristol Myers Squibb (NYSE: BMY) under which Bristol Myers Squibb agrees to acquire Karuna for $330.00 per share in cash, for a total equity value of $14.0 billion, or $12.7 billion net of estimated cash acquired. The press release further details that the transaction was unanimously approved by both the Boards of Directors of Bristol Myers Squibb and Karuna.

77. The December 22, 2023 press release further details that (i) KarXT is expected to launch in late 2024 in the U.S. as a treatment for schizophrenia in adults; (ii) a registrational clinical trial is currently underway evaluating KarXT as adjunctive treatment with current

---

[6] Karuna Therapeutics, "Bristol Myers Squibb Strengthens Neuroscience Portfolio with Acquisition of Karuna Therapeutics," December 22, 2023, https://investors.karunatx.com/news-releases/news-release-details/bristol-myers-squibb-strengthens-neuroscience-portfolio (last accessed March 13, 2024).

standard of care agents for the treatment of schizophrenia, with data expected in 2025; (iii) registrational clinical trials are currently underway evaluating KarXT for the treatment of Alzheimer's disease psychosis, with data expected in 2026; and (iv) Bristol Myers Squibb believes KarXT also has potential in additional indications, including Bipolar I disorder and Alzheimer's disease agitation.

78. On the same day as Karuna, Bristol Myers Squibb, in its own press release, announced details concerning that same merger agreement between it and Karuna.[7]

79. As reported by William Blair in December 2023, Bristol Myers Squibb considers KarXT to be a "multibillion-dollar potential revenue opportunity."

80. Recently, on January 29, 2024, Fierce Pharma reported in an article entitled "Top 10 most anticipated drug launches of 2024," that Karuna's KarXT is the "[t]he most anticipated drug."[8]

**<u>Dr. Harrigan's Pre-Suit Demands from PureTech and PureTech's Refusals to Engage</u>**

81. On or about March 26, 2023, Dr. Harrigan emailed Daphne Zohar of PureTech to inquire about financial payment and consideration owed to him as required by the Income Allocation Agreement. Dr. Harrigan stated that he "was excited to hear that you have monetized a portion of the [Karuna License Agreement] and look forward to hearing from PureTech regarding a distribution of proceeds from that license."

[7] Bristol Myers Squibb, "Bristol Myers Squibb Strengthens Neuroscience Portfolio with Acquisition of Karuna Therapeutics," December 22, 2023, https://news.bms.com/news/corporate-financial/2023/Bristol-Myers-Squibb-Strengthens-Neuroscience-Portfolio-with-Acquisition-of-Karuna-Therapeutics/default.aspx (last accessed March 13, 2024).

[8] Fierce Pharma, "Top 10 most anticipated drug launches of 2024," January 29, 2024, https://www.fiercepharma.com/special-reports/top-10-most-anticipated-drug-launches-2024 (last accessed March 13, 2024).

82. On or about April 7, 2023, Daphne Zohar of PureTech responded to Dr. Harrigan by email and claimed for the first time—without citation to any specific provision of the Income Allocation Agreement or otherwise—that "the Income Allocation Agreement is no longer in effect because you terminated your employment with Karuna before the Initial Funding occurred and therefore have no continuing employment or other recognizable interest entitling you to any financial benefits under the agreement with PureTech."

83. The Income Allocation Agreement does not reference "Initial Funding" or include a provision requiring Dr. Harrigan to forego payment or consideration thereunder based on when any "Initial Funding" occurred.

84. In that same April 7th email, Ms. Zohar, on behalf of PureTech, also claimed without any basis that "even if the Income Allocation Agreement were to be valid and in effect," "the transaction with Royalty Pharma would not trigger any payment to you."

85. The Income Allocation Agreement is clear that Dr. Harrigan is to receive a portion of the revenues otherwise payable to PureTech.

86. In that same April 7th email, Ms. Zohar, on behalf of PureTech, also commented that Dr. Harrigan "received substantial and fair compensation from [his] brief employment by Karuna and serving on its Board of Directors" and that "we hope that you recognize that the relationship was worthwhile and beneficial."

87. The Income Allocation Agreement does not include a provision requiring Dr. Harrigan to forego payment or consideration thereunder based on the length of his actual employment with Karuna (over a year) or based on whether his relationship with Karuna was worthwhile and beneficial.

88. In letter correspondence dated June 30, 2023, Dr. Harrigan, through his counsel,

responded to Ms. Zohar's April 7, 2023, correspondence. Dr. Harrigan explained, among other things, PureTech's contractual financial obligations to Dr. Harrigan under the Income Allocation Agreement as well as the baselessness of Ms. Zohar's statements. Dr. Harrigan also demanded, among other things, a full accounting of all payments due to Dr. Harrigan under the Income Allocation Agreement.

89. By letter dated July 13, 2023, counsel for PureTech responded and admitted that PureTech had received at least the following payments as of that date: (i) payment from Karuna for the sublicense to Zai Lab; (ii) milestone-related payment from Karuna for initiation of a Phase III clinical trial for KarXT of $2 million (the amount of which PureTech represents is disclosed publicly); and (iii) payment from Royalty Pharma of $100 million (the amount of which is disclosed publicly).

**COUNT I**
**(Breach of Contract)**
**(AS AGAINST DEFENDANT)**

90. Dr. Harrigan repeats and realleges each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

91. The Income Allocation Agreement is a valid, binding, and enforceable contract.

92. Under Section 2(a) of the Income Allocation Agreement, PureTech is obligated to pay Dr. Harrigan the product of "any payment or consideration received by PureTech pursuant to the terms of the License Agreement" multiplied by the "Vested Percentage" (a defined term) as well as the product of "consideration for the assignment or sale of the License Agreement to any party other than Karuna or a wholly-owned subsidiary of Karuna" multiplied by the "Vested Percentage."

93. PureTech, to date, has received at least $100 million from Royalty Pharma

"pursuant to the terms of the License Agreement" and/or as "consideration for the assignment or sale of the License Agreement."

94. PureTech breached Section 2(a) of the Income Allocation Agreement by failing to pay Dr. Harrigan the monies owed to him under that Section for the product of "any payment or consideration received by PureTech pursuant to the terms of the License Agreement" multiplied by the "Vested Percentage."

95. PureTech breached Section 2(a) of the Income Allocation Agreement by failing to pay Dr. Harrigan the monies owed to him under that Section for the product of "consideration for the assignment or sale of the License Agreement to any party other than Karuna or a wholly-owned subsidiary of Karuna" multiplied by the "Vested Percentage."

96. As a result of PureTech's breaches, Dr. Harrigan has suffered and continues to suffer damages, including interest, the precise amount of which will be determined at trial.

**COUNT II**
**(Breach of Contract)**
**(AS AGAINST DEFENDANT)**

97. Dr. Harrigan repeats and realleges each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

98. The Income Allocation Agreement is a valid, binding, and enforceable contract.

99. Under Section 2(a) of the Income Allocation Agreement, PureTech is obligated to pay Dr. Harrigan the product of "any payment or consideration received by PureTech pursuant to the terms of the License Agreement" multiped by the "Vested Percentage."

100. Under the Karuna License Agreement, Karuna agrees to pay PureTech, among other things, milestone payments under Section 3.1(b) of the Karuna License Agreement.

101. There have been at least three Phase III clinical trials for KarXT.

102. PureTech, to date, has received at least $2 million from Karuna for initiation of one Phase III clinical trial for KarXT.

103. PureTech breached Section 2(a) of the Income Allocation Agreement by failing to pay Dr. Harrigan the monies owed to him under that Section for the product of "any payment or consideration received by PureTech pursuant to the terms of the License Agreement" multiplied by the "Vested Percentage."

104. As a result of PureTech's breaches, Dr. Harrigan has suffered and continues to suffer damages, including interest, the precise amount of which will be determined at trial.

**COUNT III**
**(Breach of Contract)**
**(AS AGAINST DEFENDANT)**

105. Dr. Harrigan repeats and realleges each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

106. The Income Allocation Agreement is a valid, binding, and enforceable contract.

107. Under Section 2(a) of the Income Allocation Agreement, PureTech is obligated to pay Dr. Harrigan the product of "any payment or consideration received by PureTech pursuant to the terms of the License Agreement" multiplied by the "Vested Percentage."

108. Under the Karuna License Agreement, Karuna agrees to pay PureTech, among other things, a share of sublicense income under Section 3.1(c) of the Karuna License Agreement.

109. PureTech, to date, has received at least payment of less than $0.1 million in sublicense income by way of the Zai Lab sublicense, which is a sub-license under the terms of the Karuna License Agreement.

110. PureTech breached Section 2(a) of the Income Allocation Agreement by failing to

pay Dr. Harrigan the monies owed to him under that Section for the product of “any payment or consideration received by PureTech pursuant to the terms of the License Agreement” multiplied by the “Vested Percentage.”

111. As a result of PureTech’s breaches, Dr. Harrigan has suffered and continues to suffer damages, including interest, the precise amount of which will be determined at trial.

**COUNT IV**
**(Declaratory Judgment Under 28 U.S.C. §§ 2201, 2202)**
**(AS AGAINST DEFENDANT)**

112. Dr. Harrigan repeats and realleges each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

113. Dr. Harrigan seeks a declaratory judgment with respect to Dr. Harrigan’s rights and PureTech’s obligations under Section 2(a) of the Income Allocation Agreement, including Dr. Harrigan’s rights and PureTech’s obligations as related to revenues payable to PureTech or revenues that will be payable to PureTech from Karuna (including by way of the Karuna License Agreement) and Royalty Pharma (including by way of the Karuna License Agreement and the Royalty Purchase Agreement).

114. An actual case or controversy exists between Dr. Harrigan, on the one hand, and PureTech, on the other hand, regarding Dr. Harrigan’s rights and PureTech’s obligations under Section 2(a) of the Income Allocation Agreement, including Dr. Harrigan’s rights and PureTech’s obligations as related to revenues payable to PureTech or revenues that will be payable to PureTech from Karuna (including by way of the Karuna License Agreement) and Royalty Pharma (including by way of the Karuna License Agreement and the Royalty Purchase Agreement).

115. A declaratory judgment is therefore necessary to set forth and determine the

parties' rights and obligations under Section 2(a) of the Income Allocation Agreement.

116. Accordingly, Dr. Harrigan is entitled to a declaration declaring PureTech's obligations under Section 2(a) of the Income Allocation Agreement to pay Dr. Harrigan for his Vested Percentage of revenues payable to PureTech or revenues that will be payable to PureTech from Karuna (including by way of the Karuna License Agreement) and Royalty Pharma (including by way of the Karuna License Agreement and the Royalty Purchase Agreement).

## PRAYER FOR RELIEF

**WHEREFORE**, Dr. Harrigan prays for judgment in his favor and against PureTech providing the following relief:

A. Enter judgment in favor of Dr. Harrigan and against PureTech on all counts;

B. Award Dr. Harrigan his damages suffered as a result of PureTech's acts and any other damages and interest that Dr. Harrigan is entitled to, including by any applicable law and under the Income Allocation Agreement;

C. Enter a judgment declaring Dr. Harrigan's rights and PureTech's obligations under Section 2(a) of the Income Allocation Agreement;

D. Award Dr. Harrigan his reasonable attorneys' fees in bringing this action as allowed by law;

E. Award Dr. Harrigan pre-judgment and post-judgment interest in the maximum amount allowed by law;

F. Award Dr. Harrigan costs incurred in bringing this action; and

G. Award Dr. Harrigan other relief as this Court deems just and proper.

**JURY DEMAND**

Dr. Harrigan demands a trial by jury on all issues triable of right by a jury which are raised for determination.

Dated: March 13, 2024

Respectfully Submitted,

*/s/ Sara Lonks Wong*

Jonathan Harris (BBO No. 647524)
Sara Lonks Wong (BBO No. 693907)
NUTTER, McCLENNEN & FISH, LLP
155 Seaport Blvd.
Boston, MA 02110
jaharris@nutter.com
slonkswong@nutter.com
Tel. (617) 439-2000
Fax. (617) 310-9139

*Attorneys for Plaintiff Edmund P. Harrigan, MD*

6343948